******************************************************

The "officially released" date that appears near the beginning of an opinion is the date the opinion will be published in the Connecticut Law Journal or the date it is released as a slip opinion. The operative date for the beginning of all time periods for the filing of postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying an opinion that appear in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced or distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# STATE OF CONNECTICUT *v.* KWANZE FLUKER
## (AC 47256)

Cradle, C. J., and Elgo and Westbrook, Js.

*Syllabus*

Convicted of several crimes, including conspiracy to commit murder in the shooting death of the victim, the defendant appealed. He claimed, inter alia, that he was denied his due process right to a fair trial when the trial court denied his motion for a mistrial after a police officer testified that DNA evidence obtained from the defendant's vehicle matched the record of a "known felon" in a DNA database and that individual was the defendant. *Held*:

The trial court did not abuse its discretion in denying the defendant's motion for a mistrial, as the police officer's remark was unprompted by the state, it was an isolated occurrence, the court struck the remark from the record, the state thereafter presented testimony that helped mitigate any prejudice that may have resulted from the remark, the state's case was relatively strong, and the defendant declined the court's repeated offers to provide the jury with curative instructions; accordingly, the police officer's remark did not result in substantial and irreparable prejudice to the defendant.

The defendant failed to establish that the prosecutor's improper comments during closing argument to the jury, namely, the prosecutor's reference to a witness as a "snitch," which improperly referenced testimony stricken by the trial court, her assertion that a witness testified that the defendant used a "street name," which was contrary to the actual testimony, and the prosecutor's improper appeal for sympathy for the victim, violated the defendant's due process right to a fair trial, as, although the defendant did not invite any of the improprieties, the defendant did not object, request curative instructions or move for a new trial on the basis of those comments, which were not severe, frequent or central to the state's case, the improper effect of any of the comments was diminished by the court's general instructions to the jury after closing arguments, and, as the state's case was strong and persuasive, there was no reasonable likelihood that the jury's verdict would have been different in the absence of the prosecutor's improper comments.

The trial court did not commit plain error, as the defendant claimed, by failing to provide the jury, sua sponte, with a special credibility instruction regarding the testimony of his accomplice, who had entered into a cooperation agreement with the state, as the defendant did not provide any authority that required the court to give such an instruction sua sponte, he did not claim that the instructions the court gave the jury on witness credibility and accomplice testimony were improper, and, under the law existing at the time of his trial, the defendant was not entitled to an instruction singling out a state's witness and highlighting that witness' motive for testifying falsely.

Argued January 5—officially released July 28, 2026

*Procedural History*

Substitute information charging the defendant with the crimes of conspiracy to commit murder, arson in the second degree, arson in the third degree and tampering with or fabricating physical evidence, brought to the Superior Court in the judicial district of Hartford and tried to the jury before *Schuman, J.*; thereafter, the court denied the defendant's motion for a mistrial; verdict and judgment of guilty of conspiracy to commit murder, arson in the second degree and tampering with or fabricating physical evidence, from which the defendant appealed to this court. *Affirmed*.

*Ruth Burke*, deputy assistant public defender, for the appellant (defendant).

*Jonathan M. Sousa*, assistant state's attorney, with whom, on the brief, were *Sharmese L. Walcott*, state's attorney, *Samantha Magnani*, assistant state's attorney, *Olivia Jones*, special deputy assistant state's attorney, and *Jesse Giddings*, former supervisory assistant state's attorney, for the appellee (state).

*Opinion*

CRADLE, C. J. The defendant, Kwanze Fluker, appeals from the judgment of conviction, rendered following a jury trial, of conspiracy to commit murder in violation of General Statutes §§ 53a-48 (a) and 53-54a (a), arson in the second degree in violation of General Statutes § 53a-112 (a) (1) (B), and tampering with or fabricating physical evidence in violation of General Statutes § 53a-155 (a) (1). On appeal, the defendant claims that (1) the trial court improperly denied his motion for a mistrial, (2) the prosecutor engaged in improprieties during the trial and closing argument that deprived him of his due process right to a fair trial, and (3) the court committed plain error by failing, sua sponte, to provide the jury with a special credibility instruction with respect to the testimony of a witness who had a cooperation agreement

with the state. We disagree and, accordingly, affirm the judgment of the trial court.

The following facts, which the jury reasonably could have found, and procedural history are relevant to the resolution of this appeal. On August 29, 2021, the defendant called Emmanuel Floyd, an acquaintance of his for several years, and asked him to meet. The two men, while remaining on the phone with each other,[1] met on Blue Hills Avenue in Bloomfield. The defendant arrived in a 2008 Nissan Maxima, and Floyd arrived in a 2006 BMW 530i and in possession of a nine millimeter Glock 19 handgun. While Floyd and the defendant were together, they saw the victim, Dominique Miller, drive past them in a red Polaris Slingshot. According to Floyd, the defendant suggested that they follow the victim "to talk to him" because "[the defendant] was [mad] [that the victim] was chumming with Marion Edwards," who had "told on [the defendant] before . . . ." Floyd agreed. Floyd, too, had a "problem" with the victim because the victim "had shot at [Floyd] before."

The defendant and Floyd then followed the victim in their vehicles. They initially lost him but then located him nearby on Euclid Street. The two men continued to follow the victim, first to a nearby party on Granby Street and then to Madison Motors, LLC (Madison Motors), an automobile dealership and repair shop in Bloomfield. While the victim was at Madison Motors, the defendant drove to a nearby Burger King restaurant, and Floyd drove to a nearby Home Depot store. Once the victim left Madison Motors, he drove to a gas station on Blue Hills Avenue, with the defendant and Floyd still following him. After the victim left the gas station, he traveled onto Interstate 91 northbound while Floyd and the defendant continued following him. While on Interstate 91, the victim sped up. The defendant instructed Floyd to speed up as well because he was in a faster vehicle and told him "to get

---

[1] Call logs established that Floyd and the defendant spoke for approximately eight and one-half hours from August 28 through September 1, 2021, including during the one and one-half hours leading up to and including the time of the shooting.

right and shoot [the victim]." Floyd refused because he did not want to shoot the victim while they were driving on the highway. The victim then drove off of Interstate 91 at exit 42, and Floyd and the defendant followed. The victim stopped at a red traffic signal in the left lane of the off ramp, and Floyd drove alongside him in the right lane. The defendant then again instructed Floyd to "get it right, shoot him now, shoot him now, do it . . . ." Floyd then fired six gunshots at the victim and left the area.

Not long after the shooting, a complainant called 911 to report that she had found the victim deceased in his car on the exit 42 off ramp of Interstate 91 northbound. Officers with the Windsor Locks Police Department and Connecticut State Police arrived at the scene and found the victim in the driver's side of the Slingshot with his head slumped over, as well as multiple shell casings on the ground by the Slingshot's passenger side. Paramedics then arrived, and the victim was pronounced dead at the scene. Autopsy and ballistics evidence later established that the cause of death was four gunshot wounds, one each to the head and neck, and two to the upper torso.

There were no known eyewitnesses and no available surveillance footage of the shooting was found.[2] The lead investigator, Detective Christopher Scott of the Connecticut State Police, Central District Major Crimes Squad (major crimes squad), and other investigating officers were able to identify the victim's last known location. The officers were then able to collect surveillance footage from several nearby businesses and to track his movements until he drove onto Interstate 91 northbound. While observing the surveillance footage, the investigating officers noticed the same two vehicles, a 2008 Nissan Maxima and a 2006 BMW 530i, following the victim.[3]

---

[2]The complainant who called 911 did not witness the shooting.

[3]The officers determined that the Nissan had a distinctive faded hood, tinted windows, and a sticker on the rear driver's side window, but they were unable to obtain a license plate number for it at that time based on the surveillance footage. The officers also determined that the BMW had a visible dent, a dark bumper, and tinted windows, and were able to obtain a partial license plate number.

The officers obtained cell site location information (CSLI) that provided evidence that the defendant's and Floyd's cell phones were at locations that corresponded to the vehicles' presence on the surveillance footage. The officers also obtained surveillance footage of the driver of the Nissan at the Burger King drive-through. The driver was wearing sunglasses, which covered his eyes, and a surgical mask pulled down to his chin, which left the remainder of his face exposed.

On August 31, 2021, Scott and Detective Michael Stanger, also with the major crimes squad, saw a Nissan in Bloomfield that matched the description of the Nissan in the surveillance footage.[4] When the officers approached, the vehicle sped off and evaded the police; however, the officers were able to obtain the license plate number, which they later determined was not registered to the Nissan.

On September 1, 2021, the officers observed Floyd driving his BMW[5] in Bloomfield and detained him. The officers brought Floyd to the state police Troop H barracks in Hartford for questioning and seized his cell phone and the BMW as evidence.[6] Floyd told the officers that he was at home on the day of the shooting and never mentioned the defendant.

On September 3, 2021, police officers investigating an unrelated matter saw the Nissan in Hartford. They alerted officers with the major crimes squad and attempted to block the vehicle into a driveway. In an

---

[4]Scott testified that "[t]he faded hood, the tinted windows, and the sticker on the rear driver's side" had drawn his attention to the vehicle.

[5]The officers determined that Floyd was the registered owner of the BMW.

[6]Scott testified that two search warrants were obtained, one for Floyd's cell phone and another for his BMW. The search of Floyd's cell phone revealed the following Internet searches: "how fast does a Slingshot go," "homicide in Windsor Locks," "man found dead off [Interstate 91] Windsor Locks, Connecticut," "Kwanze Fluker," and "car wash near me." Police officers also found that Floyd had screenshotted multiple photos of the victim and his family. As for Floyd's BMW, the steering wheel contained particles consistent with gunshot residue.

attempt to evade the officers, the defendant backed the Nissan into a garage at the other end of the driveway, hitting the corner of the garage, before driving forward, colliding with police and civilian vehicles, going through a chain-link fence and out another driveway. Scott and Stanger responded to the location and observed the Nissan leaving the scene.

Shortly thereafter, police officers received a report of a car on fire at the intersection of Princeton Lane and Millbrook Drive in East Hartford.[7] Police officers responded to the scene to find the Nissan on fire. They were able to recover from the vehicle an opened Lunchables food container from the floor under the driver's seat, the vehicle's gas cap, a box of matches, and a lighter. The officers subsequently were able to confirm that the fire was incendiary and that the likely ignition source was that of a person applying an open flame to the passenger seat's fabric. The officers also took swabs of the inside of the Lunchables container and the vehicle's gas cap. The swabs were submitted to the state forensics laboratory for testing. DNA profiles were generated from those samples and compared to a DNA profile that later was developed from a swab of the defendant's saliva.[8] The results indicated that the defendant was a DNA contributor to both samples.[9] In addition, the CSLI obtained during the investigation confirmed that the defendant had been in the area of that intersection prior to the discovery of the burned Nissan.

Police officers were also able to obtain the vehicle identification number of the Nissan and located its last

[7]A witness who saw the car on fire and called 911 testified that he was unable to identify the person he saw get out of the car but informed the responding police officers that the individual was a Black male wearing a black mask and black hoodie who told the witness that his car was overheating before leaving the scene on foot.

[8]Scott testified that a search warrant had been obtained for the buccal swab of the defendant's saliva, which Scott executed on February 10, 2022. That buccal swab was sent to the state laboratory for forensic testing in order to generate the defendant's DNA profile for comparison.

[9]The defendant's DNA profile was consistent with one of two contributors to the DNA profile developed from the Lunchables container and of one of three contributors to the DNA profile developed from the gas cap.

known owner, who informed the officers that he had sold the vehicle to Tiffany Castro in Bridgeport. Castro testified that, in August 2021, she sold the Nissan on Facebook Marketplace to a Black man who arrived in an Uber to make the purchase. Castro provided the police with two phone numbers that the buyer had used, one of which was associated with the defendant, and the Facebook messages between them. Because the purchaser, who was later identified as the defendant, used the name "Willie Mays" when communicating with Castro on Facebook, the police were able to link the Facebook profile for "Willie Mays" to the defendant through the account's profile photo and associated email address (kwanze.fluker@facebook.com).

The defendant was arrested pursuant to a warrant and subsequently charged in a long form information with one count of conspiracy to commit murder in violation of §§ 53a-48 (a) and 53a-54a (a) (count one), one count of arson in the second degree in violation of § 53a-112 (a) (1) (B) (count two), one count arson in the third degree in violation of General Statutes § 53a-113 (a) (count three), and one count of tampering with or fabricating physical evidence in violation of § 53a-155 (a) (1) (count four). Following a jury trial during several days in July and August 2023, the defendant was found guilty of conspiracy to commit murder, arson in the second degree, and tampering with or fabricating physical evidence.[10] On October 12, 2023, the trial court, *Schuman, J.*, sentenced the defendant to thirty-five years of incarceration.[11] This appeal followed. Additional facts and procedural history will be set forth as necessary.

---

[10] Because the jury found the defendant guilty of arson in the second degree, it did not consider the charge of arson in the third degree, and, therefore, count three was merged with count two.

[11] The trial court sentenced the defendant to twenty years of incarceration on the charge of conspiracy to commit murder and fifteen years of incarceration on the charge of arson in the second degree, to run consecutively to each other. In addition, the court sentenced the defendant to five years of incarceration on the charge of tampering with or fabricating physical evidence, to run concurrently, for a total effective sentence of thirty-five years of incarceration.

## I

The defendant first claims that the trial court improperly denied his motion for a mistrial. The defendant contends that the court should have declared a mistrial because Scott's testimony that the DNA obtained from the Lunchables container matched the DNA profile of a "known felon" and that Scott's subsequent identification of that person as the defendant was so prejudicial that the testimony deprived the defendant of his due process right to a fair trial. We disagree.

The record reveals the following additional facts and procedural history that are relevant to the resolution of this claim. Scott testified during the state's case-in-chief that a search warrant was obtained for the Nissan and that, on September 22, 2021, officers with the major crimes squad conducted a search of the vehicle. Scott further testified that a Lunchables food container was recovered from the vehicle and that a swab was taken from that container and sent to the state forensics laboratory for DNA testing. The prosecutor asked Scott to discuss a DNA "hit" notification generated by the Combined DNA Index System (CODIS).[12] The following colloquy took place:

"[The Prosecutor]: At some point during the course of this investigation, and I'm going to ask you to tell me if you recall when, were you notified by the state lab of a DNA match or DNA hit from the Lunchable[s] [container]?

"[Scott]: I was notified of a DNA—it was considered a CODIS hit.

"[The Prosecutor]: Okay.

"[Scott]: And I was informed that it matched a record on file for a known felon.

---

[12] "CODIS contains DNA profiles from unsolved crimes and compares them to known samples from convicted felons that are periodically added to the database." (Internal quotation marks omitted.) *Jones* v. *State*, 237 Conn. App. 737, 739 n.2, 353 A.3d 76, cert. denied, 354 Conn. 928, 353 A.3d 847 (2026).

"[The Prosecutor]: Okay. I'm going to ask the court to—

"[Defense Counsel]: Objection, Your Honor.

"[The Court]: The objection was relevance? Overruled.

"[The Prosecutor]: Who was that individual that was named?

"[Scott]: It was named Kwanze Fluker."

The defendant did not object further, and the prosecutor's direct examination of Scott continued. The trial court later met with counsel at a sidebar conference before excusing the jury for the day. Once the jury was excused, the defendant orally moved for a mistrial based on Scott's testimony, arguing that the testimony constituted "a very direct implication that [the defendant] was a known felon," which was "information not in the record" that was unduly prejudicial, especially given that the defendant did not intend to testify in order to prevent such evidence from being elicited. The prosecutor argued that Scott's testimony only implied, rather than directly asserted, that the defendant was a known felon and that the use of "felon . . . was in connection with CODIS" rather than the defendant. The prosecutor asked the court to give a curative instruction if the court believed that there was "any kind of prejudice" and to strike the remark from the record. The prosecutor also offered to call a witness from the state forensics laboratory who would testify that CODIS contains profiles other than those of convicted felons.

The trial court noted that it "did not hear the witness refer to felons" and that it had "misconstrued the defendant's objection." The court further explained: "I didn't know that you were objecting to the reference to felon, and I should have sustained the objection. But, given the situation we're in now, I think the curative instruction is sufficient to address the situation, knowing that jurors are presumed to follow instructions, and I can also repeat the instruction in the closing . . . charge

to the jury. I also think that testimony from the [state's proposed] DNA witness . . . as to the type of information that CODIS includes and [that it] is not limited to known felons will help meliorate the situation. And even [defense counsel] agrees that there was no direct statement that the defendant is a known felon, although the witness' testimony may have created that—may have implied that." The court then asked defense counsel whether it should give a curative instruction to the jury. Defense counsel requested that the court replay the recording of Scott's testimony. After the playback of the testimony, the court explained that, "the witness stated that the DNA matched a record for a known felon and then after that said the individual was [the defendant]." In response, defense counsel argued: "For a known felon, and that individual is [the defendant], sounds to me like directly saying that [the defendant] is a known felon." The court agreed but stated that the appropriate remedy was a curative instruction and afforded the defendant the opportunity to consider the proposed remedy overnight.

The following day, the defendant declined the trial court's offer to give the jury a curative instruction, reasoning that there was no curative instruction that could cure the defect created by Scott's testimony and that "any curative instruction might just highlight the information." The court then asked, "[a]nd even an instruction to the effect that the jury should disregard the testimony from . . . Scott concerning why there was a hit on the CODIS network and that the jury should draw no inference of guilt from the CODIS hit, you're declining or you ask that I not give that instruction?" Defense counsel answered affirmatively, again reasoning that "it would just draw attention to that fact . . . ." The prosecutor argued that the motion for a mistrial should be denied but that she would "join in the application for a cautionary instruction" should the defendant choose to seek one. The prosecutor then offered again to call a witness from the state forensics laboratory to testify regarding the information contained in CODIS

and requested that the court strike Scott's remark from the record.

The trial court then denied the defendant's motion for a mistrial. The court explained: "One, I am striking the testimony of the witness that the DNA obtained from the evidence matched a record for a known felon, which means that the state cannot rely on it for closing argument . . . . Second, I will note that [the] testimony was unsolicited by the state. The state's question did not call for a response that the DNA matched the record for a known felon. So, there was no prosecutorial misconduct involved. Third, I am more than willing to charge the jury or caution the jury . . . that they should disregard that testimony, that they should draw no inference of guilt from the CODIS hit. They should rely on the presumption of innocence. But the defendant has asked that I not give that instruction, and I will adhere to the defendant's request in that regard. But I am certainly willing to do so. I'm also willing to do so in the closing charge to the jury and will entertain a request from the defendant or the state to charge in that regard and see what the positions of the parties are at that time. I don't feel, although the evidence was inadmissible, that it's shocking; it's not, as defense counsel says, it's not surprising that a CODIS hit would be from a known felon, but I agree that it's inadmissible."

The trial court also reasoned that it believed that the testimony by the state's witness concerning CODIS would further ameliorate any resulting prejudice. The state then called Megan Olt, a DNA analyst and forensic science examiner with the state forensic science laboratory, who testified that CODIS is "a database of known and unknown profiles that are searched regularly," which includes individuals who do not have prior criminal records, and that "[t]he purpose of the database is to provide investigative leads either linking a case to [a] case or a case to a known profile."

After the close of evidence, the trial court discussed the jury charge with counsel and the defendant. The

following colloquy between the court, defense counsel, and the prosecutor occurred:

"The Court: . . . The only issue that I want to make sure of at this point, because it's really a request not to charge on something that I would charge on, is this: I had proposed in my charge two sentences under a title called specific evidence, the title could change, but those two sentences are as follows. You should disregard any testimony of . . . Scott concerning the background of the persons on the CODIS database. You may draw no inference of guilt from the fact that the defendant's name was on the CODIS database. It's my understanding . . . that [the defendant] do[es] not want me to give that charge.

"[Defense Counsel]: That's correct, Your Honor. We would decline that instruction for the reason that . . . what the jury has heard they've already heard, and we can't put the cat back in the box, basically. And my concern is, if I have the instruction there, it would simply draw attention to it again.

"[The Court]: All right. That's a choice you can make. What's the state's position on that?

"[The Prosecutor]: Judge, the state had requested that you read the instruction, but as long as it is on the record, what you were going to read, and the defendant declines it, then I think the record is clear."

After the charge conference,[13] the defendant orally renewed his motion for a mistrial, which the trial court

---

[13]The record indicates that a charge conference was conducted in chambers off the record. After the close of evidence on August 4, 2023, the court summarized the charge conference on the record, explaining that "[it] [had] sent an initial draft of the substantive part of the charge to the jury to counsel by email approximately a week [prior]. Then [it] met with counsel briefly . . . [on August 3, 2023] in chambers. [They] discussed the charge. [The court] sent a revised and complete copy of the draft charge to counsel [on August 3, 2023] at the close of business. Then [they] met [the] morning [of August 4, 2023], and [the court] discussed the charge with counsel, [the court] did make some changes in light of that discussion and [it] sent a final draft to counsel . . . [via] email. [Accordingly] [the court] believe[d] [that] [it] ha[d] satisfied the Practice Book requirement for a charge conference."

"denied essentially for the same reasons [it] denied [the motion] earlier in that the answer was unsolicited by the state and [the court had] offered . . . twice to provide a curative instruction to the jury. Defense [counsel] declined to authorize [the court] to do so." The court also explained that Olt's testimony regarding the CODIS database would mitigate any prejudice. Finally, at sentencing, the defendant again renewed his motion for a mistrial, which the court also denied, reasoning that it had "made the right decision in denying the motion for a new trial [and] offered cures to the defendant, which the defendant declined to accept."

On appeal, the defendant claims that the trial court improperly denied his motion for a mistrial. "Practice Book § 42-43 provides in relevant part: Upon motion of a defendant, the judicial authority may declare a mistrial at any time during the trial if there occurs during the trial an error or legal defect in the proceedings, or any conduct inside or outside the courtroom which results in substantial and irreparable prejudice to the defendant's case. . . . The defendant bears the burden to establish prejudice. . . . We review a trial court's ruling on a motion for a mistrial under the abuse of discretion standard. . . . When reviewing a ruling on a mistrial motion, we must ask whether the trial court considered the totality of the circumstances in arriving at its decision. . . . Further, our review must take into account the trial judge's superior opportunity to assess the proceedings over which he or she has personally presided. . . . Every reasonable presumption will be given in favor of the trial court's ruling . . . .

"Furthermore, [w]hile the remedy of a mistrial is permitted under the rules of practice, it is not favored. [A] mistrial should be granted only as a result of some occurrence upon the trial of such a character that it is apparent to the court that because of it a party cannot have a fair trial . . . and the whole proceedings are vitiated. . . . *If curative action can obviate the prejudice, the drastic remedy of a mistrial should be avoided.* . . . On

appeal, we hesitate to disturb a decision not to declare a mistrial. The trial judge is the arbiter of the many circumstances [that] may arise during the trial in which his . . . function is to assure a fair and just outcome. . . . *The trial court is better positioned than we are to evaluate in the first instance whether a certain occurrence is prejudicial to the defendant and, if so, what remedy is necessary to cure that prejudice*." (Citations omitted; emphasis added; footnote omitted; internal quotation marks omitted.) *State* v. *Nichols*, 226 Conn. App. 359, 368–70, 317 A.3d 861 (2024).

On appeal, the defendant argues, as he did before the trial court, that Scott's testimony that the DNA profile generated from the swab of the Lunchables container "matched a record on file for a known felon" and that the individual "was named Kwanze Fluker" improperly exposed the defendant's criminal history to the jury and "was not only inadmissible, but it was highly prejudicial and stigmatized the defendant to the jury," and, therefore, the court should have granted his motion for a mistrial. We agree with the defendant, and the court, that Scott's testimony that the DNA profile from the Lunchables swab "matched a record on file for a known felon" was inadmissible.[14] See, e.g., *State* v. *Collins*, 206 Conn. App. 438, 452, 260 A.3d 507 ("[a]s a general rule, evidence of a defendant's prior crimes or misconduct is not admissible" (internal quotation marks omitted)), cert. denied, 339 Conn. 914, 262 A.3d 135 (2021). Nevertheless, because Scott's remark was unprompted by the state, the remark was an isolated occurrence, the court struck the challenged remark so that the state could not rely on it during closing argument to the jury, Olt's testimony helped to mitigate any prejudice, the state's case was relatively strong, and the court repeatedly offered curative instructions that were rejected by the defendant, we do not conclude that the remark resulted in substantial and irreparable prejudice that deprived the defendant of his due process right to a fair trial,

---

[14]The state rightfully does not contend otherwise.

and, therefore, we agree with the court that a mistrial was unwarranted in this case.

Our reviewing courts have declined to find an abuse of the trial court's discretion in denying a motion for a mistrial in cases in which a witness or prosecutor briefly referenced a defendant's prior criminal misconduct or conviction in the presence of the jury. See, e.g., *State* v. *Fleming*, 198 Conn. 255, 264–66, 502 A.2d 886 (curative instructions were sufficient to eliminate any prejudice resulting from witness testimony "that the defendant had 'talked about getting down in robbery again'"), cert. denied, 475 U.S. 1143, 106 S. Ct. 1797, 90 L. Ed. 2d 342 (1986); *State* v. *Tarver*, 166 Conn. App. 304, 322, 328–30, 141 A.3d 940 (curative instructions obviated any prejudice from witness' testimony that "'[the defendant] went to jail for robbery'" and had previously been in jail), cert. denied, 323 Conn. 908, 150 A.3d 683 (2016); *State* v. *Vitale*, 76 Conn. App. 1, 10–13, 818 A.2d 134 (curative instructions remedied prejudice from witness' statement that "[the defendant said], 'I'm on parole, I'm going to jail'"), cert. denied, 264 Conn. 906, 826 A.2d 178 (2003). In each of those cases, the trial court promptly issued a curative instruction and struck the testimony. See *State* v. *Tarver*, supra, 328 ("the giving of a curative instruction . . . carries great weight in our determination of whether the court's denial of a motion for a mistrial was an abuse of discretion"). In this case, however, the defendant was given several opportunities to have the court issue such an instruction but declined each time.[15] By declining the court's repeated offers for curative instructions, "the defendant made a legitimate tactical decision not to emphasize the testimony. This

---

[15] Although the trial court initially overruled the defendant's objection and did not strike the testimony or have the opportunity to issue a curative instruction until the following day, fault cannot be attributed to the court. Defense counsel did not state the basis for the objection. In addition, defense counsel did not clarify the actual grounds for her objection when the court clearly indicated that it believed that she was objecting on relevance grounds. She also did not object to Scott's subsequent identification of the defendant as the DNA match, which would have given her another opportunity to make her objection clear.

court will not second-guess such decisions on appeal.” (Footnote omitted.) *State* v. *Mitchell*, 110 Conn. App. 305, 314–15, 955 A.2d 84, cert. denied, 289 Conn. 946, 959 A.2d 1012 (2008).

The defendant acknowledges that he declined the trial court’s repeated offers of a curative instruction but nevertheless contends that “[n]o curative instruction could cure the prejudice, as any curative measure would only draw more attention to the damaging testimony.” In the present case, the court reasonably could have concluded that, even if Scott’s remark was injurious enough to necessitate an instruction, a mistrial was unwarranted. Although it is true that, in some cases, a statement may be so prejudicial that even a curative instruction would be insufficient to dispel the prejudice, that is not the case here. We repeatedly have stated that “[d]efense counsel cannot opt for a mistrial instead of a curative instruction, as if the two were interchangeable. If defense counsel decides to move for [a] mistrial and altogether eschews the instruction, the trial court cannot be compelled by that decision to go further than it otherwise would.” (Internal quotation marks omitted.) *State* v. *Collins*, supra, 206 Conn. App. 454. We need not speculate as to the potential effect of the proposed curative instructions.

For the foregoing reasons, we conclude that the defendant has failed to show that the trial court abused its discretion in denying his motion for a mistrial on the basis of Scott’s testimony.

II

The defendant also claims that he was deprived of his due process right to a fair trial because the prosecutor engaged in impropriety during the trial and closing argument by improperly appealing to the jurors’ emotions through her stigmatization of the defendant because of his criminal history and her invocation of sympathy for the victim, as well as by commenting on facts not in evidence. We agree that the prosecutor made certain

improper statements during closing arguments but conclude that those improprieties did not deprive the defendant of a fair trial.

Before addressing the defendant's specific claims on appeal, we first set forth general principles governing our review of claims of prosecutorial impropriety. "In analyzing claims of prosecutorial impropriety, we engage in a two step analytical process. . . . The two steps are separate and distinct. . . . We first examine whether prosecutorial impropriety occurred. . . . Second, if an impropriety exists, we then examine whether it deprived the defendant of his due process right to a fair trial. . . . In other words, an impropriety is an impropriety, regardless of its ultimate effect on the fairness of the trial. Whether that impropriety was harmful and thus caused or contributed to a due process violation involves a separate and distinct inquiry. . . .

"[O]ur determination of whether any improper conduct by the [prosecutor] violated the defendant's fair trial rights is predicated on the factors set forth in *State* v. *Williams*, [204 Conn. 523, 540, 529 A.2d 653 (1987)], with due consideration of whether that [impropriety] was objected to at trial. . . . These factors include: [1] the extent to which the [impropriety] was invited by defense conduct or argument . . . [2] the severity of the [impropriety] . . . [3] the frequency of the [impropriety] . . . [4] the centrality of the [impropriety] to the critical issues in the case . . . [5] the strength of the curative measures adopted . . . and [6] the strength of the state's case. . . . The question of whether the defendant has been prejudiced by prosecutorial [impropriety] depends on whether there is a reasonable likelihood that the jury's verdict would have been different absent the sum total of the improprieties. . . . Under the *Williams* general due process standard, the defendant has the burden to show both that the prosecutor's conduct was improper and that it caused prejudice to his defense. . . . The two steps of [our] analysis are separate and distinct, and we may reject the claim if we conclude [that] the defendant

has failed to establish either prong." (Internal quotation marks omitted.) *State* v. *Antwon B.*, 236 Conn. App. 428, 455, 348 A.3d 814 (2025), cert. denied, 354 Conn. 910, 349 A.3d 1094 (2026).

"[W]e must examine not only whether any individual impropriety deprived the defendant of his right to a fair trial, but also whether the cumulative effect of multiple improprieties . . . deprived [him] of his . . . right to a fair trial. . . . To [do so], we must determine whether the sum total of [the prosecutor's] improprieties rendered the defendant's [trial] fundamentally unfair . . . . We review the instances of impropriety in the context of the entire trial and not in a vacuum." (Citation omitted; internal quotation marks omitted.) *State* v. *Dabate*, 351 Conn. 428, 437, 331 A.3d 1159 (2025).

We recognize that defense counsel did not object to many of the alleged improprieties at trial. "[O]ur Supreme Court has explained that a defendant's failure to object at trial to each of the occurrences that he [or she] now raises as instances of prosecutorial impropriety, though relevant to our inquiry, is not fatal to review of his [or her] claims. . . . This does not mean, however, that the absence of an objection at trial does not play a significant role in the determination of whether the challenged statements were, in fact, improper. . . . To the contrary, we continue to adhere to the well established maxim that defense counsel's failure to object to the [alleged improprieties at the time they occurred] suggests that defense counsel did not believe that [they were] [improper] in light of the record of the case at the time." (Internal quotation marks omitted.) *State* v. *Antwon B.*, supra, 236 Conn. App. 456–57.

Because several of the alleged improprieties took place during the prosecutor's closing argument, we set forth the following additional relevant legal principles. "It is well established that prosecutorial [impropriety] of a constitutional magnitude can occur in the course of closing arguments. . . . When making closing arguments to the jury, [however, counsel] must be allowed a generous

latitude in argument, as the limits of legitimate argument and fair comment cannot be determined precisely by rule and line, and something must be allowed for the zeal of counsel in the heat of argument. . . . Thus, as the state's advocate, a prosecutor may argue the state's case forcefully, [provided the argument is] fair and based [on] the facts in evidence and the reasonable inferences to be drawn therefrom. . . .

"Nevertheless, the prosecutor has a heightened duty to avoid argument that strays from the evidence or diverts the jury's attention from the facts of the case. [The prosecutor] is not only an officer of the court, like every attorney, but is also a high public officer, representing the people of the [s]tate, who seek impartial justice for the guilty as much as for the innocent. . . . By reason of his [or her] office, he [or she] usually exercises great influence [on] jurors. . . . While the privilege of counsel in addressing the jury should not be too closely narrowed or unduly hampered, it must never be used as a license to state, or to comment [on], or to suggest an inference from, facts not in evidence, or to present matters [that] the jury ha[s] no right to consider." (Internal quotation marks omitted.) Id., 456.

Finally, "[i]t is axiomatic that a prosecutor may not advance an argument that is intended solely to appeal to the jurors' emotions and to evoke sympathy for the victim or outrage at the defendant. . . . An appeal to emotions, passions, or prejudices improperly diverts the jury's attention away from the facts and makes it more difficult for it to decide the case on the evidence in the record. . . . When the prosecutor appeals to emotions, he invites the jury to decide the case, not according to a rational appraisal of the evidence, but on the basis of powerful and irrelevant factors [that] are likely to skew that appraisal. . . . An improper appeal to the jurors' emotions can take the form of a personal attack on the defendant's character . . . or a plea for sympathy for the victim or her family." (Internal quotation marks omitted.) *State* v. *Michael T.*, 338 Conn. 705, 725, 259 A.3d

617 (2021). With these principles in mind, we address each alleged impropriety in turn.

A

The defendant first claims that the prosecutor improperly adopted or attempted to elicit testimony concerning the defendant's criminal history "to stigmatize the defendant and paint him as a dangerous criminal to the jury" by eliciting and adopting testimony from Scott that the defendant was a known felon. As discussed in part I of this opinion, the testimony at issue arose in the context of questions concerning the DNA sample taken from the Lunchables container recovered from the defendant's vehicle. Scott testified that, after a CODIS search was completed, he received a notification that the sample matched with someone in the CODIS system and indicated that a "known felon" was a contributor to the sample.[16] On appeal, the defendant argues that, by asking, "[w]ho was that individual that was named," the prosecutor "vicariously adopted [Scott's] testimony and further elicited prejudicial information for the sole purpose of disparaging the defendant to the jury." We disagree.[17]

The record does not support the defendant's assertion that the prosecutor adopted Scott's inadmissible testimony by asking him to identify the individual profile matching the CODIS hit. There is no indication in the record that, by asking this question, the prosecutor was trying to link the defendant's name to the phrase "known felon." Rather, the clear objective of the prosecutor's

[16]The complete facts and procedural history regarding Scott's "known felon" testimony are set forth in part I of this opinion.

[17]The state contends that we need not address this claim because it is an "unpreserved evidentiary [claim] masquerading as [a] constitutional [claim] . . . ." (Internal quotation marks omitted.) *State* v. *Morel-Vargas*, 343 Conn. 247, 273, 273 A.3d 661, cert. denied,    U.S.    , 143 S. Ct. 263, 214 L. Ed. 2d 114 (2022). Because we agree with the state that the prosecutor's remarks were not improper, we need not decide whether the defendant's prosecutorial impropriety claim is actually an unpreserved evidentiary claim. See *State* v. *Diaz*, 348 Conn. 750, 769, 311 A.3d 714 (2024).

question was to elicit evidence that the defendant was the "individual" whose DNA profile matched with the sample taken from the Lunchables container in an attempt to provide forensic evidence connecting the defendant to the Nissan. The prosecutor therefore did not commit any impropriety by asking that question.[18]

Our conclusion is further supported by the prosecutor's efforts to cure any prejudice resulting from Scott's remark. The prosecutor conceded that the testimony was inadmissible, asked for a curative instruction if the court or the defendant thought one was appropriate, agreed that the remark should be stricken, and called another witness, Olt, to testify regarding the information in CODIS in order to ameliorate any prejudicial impact of Scott's testimony. Because there was no impropriety, this claim fails.

B

The defendant next claims that the prosecutor improperly attempted to elicit testimony concerning the defendant's criminal history in order "to stigmatize the defendant and paint him as a dangerous criminal to the jury" by asking Floyd to elaborate on the defendant's motive for killing the victim. The state argues that we need not address this claim of impropriety because it is an unpreserved evidentiary claim. We agree.

The following additional facts and procedural history are necessary to our resolution of this claim. Floyd testified, inter alia, regarding the defendant's and his motives for killing the victim. The following colloquy occurred between the prosecutor and Floyd:

---

[18]Insofar as the defendant contends that the prosecutor's initial question was an attempt to elicit improper testimony regarding the defendant's criminal history, we disagree. The prosecutor's question clearly did not call for Scott's testimony that the DNA match was for a "known felon" because the prosecutor asked only *when* the state laboratory notified Scott of the DNA match. We also note the trial court's statement in denying the defendant's motion for a mistrial, although it is not binding on this court, that "[t]here was no prosecutorial misconduct involved" with respect to the prosecutor's question.

"[The Prosecutor]: Do you know why [the defendant] suggested you should follow [the victim]?

"[Floyd]: I know he said he wanted to talk to him.

"[The Prosecutor]: What did he want to talk to him about?

"[Floyd]: He was [mad] [that] he was chumming with Marion Edwards.

"[The Prosecutor]: Who is . . . Edwards?

"[Floyd]: [The victim's] friend. . . .

"[The Prosecutor]: Did you have any kind of problems with . . . Edwards?

"[Floyd]: Yeah. Kind of.

"[The Prosecutor]: What kind of problem?

"[Floyd]: I know he had shot at me before. . . .

"[The Prosecutor]: What about [the defendant], do you know if he had a problem with . . . Edwards?

"[Floyd]: Yeah.

"[The Prosecutor]: What was that about?

"[Floyd]: Well, he said he was mad that he had told on him before, supposedly.

"[The Prosecutor]: [The defendant] was mad that [Edwards] had told on him before; what do you mean, told on him?

"[Floyd]: He said he had snitched on him in a previous case, and that's why he was [mad] at him."

Defense counsel then objected. The trial court stated, "[a]ll right. Absent objection, I'll strike that reference." The prosecutor then asked: "Judge, I can rephrase it and lead a little bit; permission to lead?" The court replied: "Yes. You may. But the jury will disregard the last sentence of the witness." The prosecutor then asked Floyd, "[w]as [the defendant] angry at [Edwards] for giving

information," to which Floyd replied, "[y]es." The defendant did not object to this question or Floyd's answer.

"Although we have held that unpreserved claims of prosecutorial impropriety are to be reviewed under the factors set forth in *State* v. *Williams*, supra, [204 Conn.] 540 . . . that rule does not apply to unpreserved evidentiary claims masquerading as constitutional claims . . . ." (Citation omitted; internal quotation marks omitted.) *State* v. *Morel-Vargas*, 343 Conn. 247, 272–73, 273 A.3d 661, cert. denied,      U.S.     , 143 S. Ct. 263, 214 L. Ed. 2d 114 (2022). "Regardless of how the defendant has framed the issue, he cannot clothe an ordinary evidentiary issue in constitutional garb to obtain appellate review. . . . [R]obing garden variety claims [of an evidentiary nature] in the majestic garb of constitutional claims does not make such claims constitutional in nature." (Citation omitted; internal quotation marks omitted.) *State* v. *Smith*, 110 Conn. App. 70, 86, 954 A.2d 202, cert. denied, 289 Conn. 954, 961 A.2d 422 (2008). In other words, "[t]he defendant can not raise a constitutional claim by attaching a constitutional label to a purely evidentiary claim or by asserting merely that a strained connection exists between the evidentiary claim and a fundamental constitutional right." (Internal quotation marks omitted.) Id., 87.

On appeal, the defendant claims that, by asking Floyd to elaborate on his initial testimony concerning the defendant's motive, the prosecutor improperly sought to elicit inadmissible testimony concerning the defendant's prior misconduct. The defendant's claim, in essence, is that the prosecutor should not have sought to elicit testimony concerning the defendant's alleged motive because "[t]he motive established at trial, that the defendant was upset that [the victim] was associating with someone who had given information in one of his past cases . . . improperly referenced the defendant's criminal past." We disagree. Although Floyd testified that the defendant was upset with Edwards because he previously had "snitched on him," the record clearly reflects that the prosecutor was

attempting to establish the defendant's motive to kill the victim. The defendant's claim therefore is a "classic evidentiary claim" because it challenges the propriety of the admission of evidence, specifically, evidence of the defendant's prior misconduct. See *State* v. *Ampero*, 144 Conn. App. 706, 714, 72 A.3d 435, cert. denied, 310 Conn. 914, 76 A.3d 631 (2013); see also *State* v. *Devito*, 159 Conn. App. 560, 574, 124 A.3d 14 (recognizing that defendant's claim that prosecutor improperly elicited testimony from multiple witnesses that implicated defendant's right to remain silent after having been advised of his rights pursuant to *Miranda* v. *Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), was unpreserved evidentiary claim rather than constitutional claim and therefore declining to address it), cert. denied, 319 Conn. 947, 125 A.3d 1012 (2015); *State* v. *Omar*, 136 Conn. App. 87, 93, 43 A.3d 766 (recognizing that defendant's claim "that the prosecutor committed impropriety at trial by eliciting . . . evidence of the defendant's subsequent drug arrest during the direct examination of [a witness] and cross-examination of the defendant" was evidentiary claim rather than constitutional claim of prosecutorial impropriety and therefore declining to address it), cert. denied, 305 Conn. 923, 47 A.3d 883 (2012). Moreover, the defendant's claim with respect to the prosecutor's question is unpreserved because the defendant never objected to that question but only to Floyd's answer. Because the defendant has couched in constitutional terms his unpreserved evidentiary claim regarding the propriety of the admission of prior misconduct evidence to prove his motive, we decline to address his claim. See *State* v. *Smith*, supra, 110 Conn. App. 87–88 ("[o]nce identified, unpreserved evidentiary claims masquerading as constitutional claims will be summarily dismissed" (internal quotation marks omitted)).

## C

The defendant next claims that the prosecutor improperly attempted to elicit testimony concerning the defendant's criminal history in order "to stigmatize

the defendant and paint him as a dangerous criminal to the jury" by asking Floyd whether he previously had "lost touch with [the defendant] and didn't see him for a period of time . . . ."[19] We disagree.

The following additional facts and procedural history are relevant to the resolution of this claim. Floyd testified, inter alia, that he had known the defendant for many years but had "hung out only a few times." During the prosecutor's direct examination, the following colloquy occurred:

"[The Prosecutor]: Would it be fair to say that you lost touch with [the defendant] and didn't see him for a period of time?

"[Defense Counsel]: Objection. Leading.

"The Court: Sustained.

"[The Prosecutor]: Judge, if we can approach?"

The trial court then held an off-the-record sidebar with counsel. Immediately after the trial resumed before the jury, the prosecutor's direct examination continued:

"[The Prosecutor]: Would it be fair to say that you lost contact with [the defendant] for a period of time?

"[Floyd]: Yes.

"[The Prosecutor]: And so, you didn't see him?

"[Floyd]: Yes.

"[The Prosecutor]: And some time in 2020 or 2021, did you get back in touch with [the defendant]?

"[Floyd]: Yes."

The prosecutor then questioned Floyd about other topics.

On appeal, the defendant claims that, by asking this question, the prosecutor was attempting "to elicit

[19]The state contends that we need not address this claim because it is an evidentiary claim rather than a constitutional one. Because we

testimony from Floyd about the defendant's prior term of incarceration . . . ." There is no indication in the record, however, that the defendant's prior term of incarceration was the reason why Floyd "lost touch" with the defendant. Moreover, the evidence in the record does not reflect that, by asking this question, the prosecutor was attempting to elicit testimony regarding the defendant's criminal history.[20] Because the prosecutor's motive is unclear from the record, we cannot determine whether the prosecutor was attempting to elicit testimony regarding the defendant's prior misconduct and term of incarceration by asking this question and, therefore, cannot assume that the prosecutor did not have a good faith basis for asking the question. See *State* v. *Pjura*, 200 Conn. App. 802, 817–18, 240 A.3d 772, cert. denied, 335 Conn. 977, 241 A.3d 131 (2020); id., 818 ("[o]n the basis of the record, we have no way of determining the prosecutor's actual motive for asking [the] question, and we [therefore] need not engage in needless speculation as to the reason the [objectionable] question was asked in the absence of direct evidence of the prosecutor's intent"). Accordingly, the defendant has failed to demonstrate that the prosecutor committed any impropriety.

Defense counsel's decisions after the prosecutor initially asked the question and after she repeated it further support our conclusion that the prosecutor did not act improperly by asking this question. When the prosecutor first asked this question, defense counsel objected, not because it was an attempt "to elicit testimony . . . about the defendant's prior term of incarceration," but because the question was "leading." In addition, after the sidebar conference, the prosecutor repeated the challenged question almost verbatim without objection from the defendant.

conclude that the prosecutor did not engage in impropriety by asking this question, we need not address this contention. See footnote 17 of this opinion.

[20]The prosecutor never, for example, asked Floyd *why* he lost touch with the defendant.

For the foregoing reasons, the defendant has failed to show that the prosecutor engaged in impropriety by asking Floyd whether he "lost contact" with the defendant.

D

The defendant's remaining claims allege prosecutorial impropriety during closing argument. We begin with the defendant's claim that the prosecutor improperly appealed to the jurors' emotions and commented on facts not in evidence by improperly suggesting that the defendant may want to have Floyd killed for testifying and using the word "snitch" when testifying. Although we disagree with the defendant's contention that the prosecutor's argument constituted impropriety, we do agree that the prosecutor acted improperly when she used the word "snitch" after the trial court had struck it from the record.

The following additional facts and procedural history are necessary to our resolution of this issue. During closing arguments, defense counsel argued, inter alia, that there were "no eyewitnesses" to the shooting of the victim and made the following remarks concerning Floyd:

"And the only witness who really implicates [the defendant] in this trial is . . . Floyd, which the state is not trying to emphasize his lack of record and so forth, but you saw . . . Floyd's demeanor in his police interview, he didn't seem nervous, he didn't seem scared. And remember in the police interview that . . . Floyd gave after being arrested, he didn't say a word about [the defendant]. And you'd think such an unsophisticated criminal would come forth, it wasn't me, it was this other guy that made me do it, you know, but no, he didn't say anything about [the defendant], he just denied his own involvement, and you saw his demeanor and attitude in the video."

Defense counsel also highlighted Floyd's cooperation agreement with the state and his resulting strong interest in testifying against the defendant. In her rebuttal argument, the prosecutor argued, inter alia:

"And, again, I believe the comment that there's no eyewitness in here, you have the testimony of . . . Floyd . . . . With regard to . . . Floyd, I don't think that it's unreasonable based on what you heard from him, you can tell the little snippet that you saw of his video interview, he was kind of sitting there drinking his coffee, right, he was talking about his jobs . . . making good eye contact with the police. As soon as they started asking him about Madison Motors or where he was that day, he kind of looked away, you could even see his facial expression, he wasn't belligerent, but you know, it's not realistic to expect that he's going to go in—and he knows he's in trouble, right, he goes there seizing his car and his phone and confessed, it's not like he said, hey, [the defendant] did it. *And again, what he did by coming in here and getting up on the witness stand, you know, in the street term, right, he was kind of a snitch, right. He did in this case by getting up on that [witness stand] and telling what he knows against [the defendant] exactly what led to [the victim] being killed in this case, right . . . Edwards told on the defendant and that's what the defendant's problem was. So, maybe it took him a little while to, you know, come around and get up on the stand, but again, his testimony is not all you have here, and I would submit to you, based on the evidence, it was credible,* but you have so much other evidence in this case to consider." (Emphasis added.) The defendant did not object to these statements.

On appeal, the defendant contends that the prosecutor "insinuate[d] that the defendant might have intentions to kill a witness against him—notably, more or less the same offense for which he was already on trial," and that this insinuation, "[was] impermissible, as it [was] speculative, inflammatory, not in the record and again incites emotion over rational evaluation of the evidence." The state argues that the prosecutor's argument "in no way implied that the defendant would seek retribution against Floyd" but that, nevertheless, "the evidence support[ed] Floyd's fear of the defendant and his initial hesitancy to provide information on the victim's murder."

This court's analysis in *State* v. *Crocker*, 83 Conn. App. 615, 852 A.2d 762, cert. denied, 271 Conn. 910, 859 A.2d 571 (2004), is instructive. In *Crocker*, the prosecutor, during closing arguments, made arguments similar to those made by the prosecutor in the present case. For example, in *Crocker*, the prosecutor argued, "[w]ell, after an incident where you witness the defendant shoot somebody in cold blood, you can understand how easy it would be to tell the police what happened in the privacy of the police station. You can understand how it's quite different sitting up there on that [witness] stand having to face this particular defendant." (Internal quotation marks omitted.) Id., 663 n.12. This court concluded that, in so arguing, the prosecutor had not acted improperly because the arguments pertained to the fear of certain witnesses, which were based on the evidence. See id., 663–64.

The same is true in the present case. The prosecutor's comments about Floyd's fear of the defendant preventing him from reporting the defendant's involvement to the police or initially intending to testify at his trial were supported by the evidence in the record, and, therefore, were not improper. Floyd testified, inter alia, that he shot the victim when told to do so by the defendant because, inter alia, "[he] was scared that [the defendant] was going to do something to both of [them]." Floyd also testified that he did not initially tell the police officers about the defendant's involvement in the victim's death because he was "scared and nervous." Floyd explained that he was afraid of the defendant "[b]ecause [Floyd] heard that [the defendant] had told [on] somebody [in] a previous case, and [he] [was] scared that [the defendant] was going to tell on him" and because "[he] didn't want to get on [the defendant's] bad side." Floyd testified that the defendant's motive in this case was the victim's relationship with Edwards, who the defendant was "mad [at because Edwards] had told on [the defendant] before, supposedly." Moreover, when the prosecutor asked Floyd whether the defendant "[w]as . . . angry at [Edwards] for giving information," Floyd replied, "[y]es." Finally,

Floyd also testified that the defendant had told him that "if he loses the trial, that he would beat people up, stab people and try to get an appeal." The defendant did not object to any of this testimony, and, accordingly, it was admitted at trial. The prosecutor, therefore, could properly rely on this evidence in closing argument as well as on any reasonable inferences from those statements, including Floyd's fear of the defendant and the defendant's alleged motive. Moreover, the prosecutor's remarks clearly were intended to address Floyd's credibility after defense counsel, in her closing argument, had highlighted Floyd's failure to report the defendant's involvement to the police earlier and his motivation for testifying. Accordingly, on the basis of Floyd's testimony, which was largely admitted without objection, it was not improper for the prosecutor to argue the reasonable inference that Floyd did not initially tell the police about the defendant's involvement or wish to testify against him because he was scared that the defendant might seek to harm him.

We do, however, agree with the defendant that the prosecutor's comment during closing argument that Floyd was "kind of a snitch" was improper because the trial court, upon the defendant's objection, had struck Floyd's testimony that "[the defendant] said [Edwards] had *snitched* on him in a previous case, and that's why he was [mad] at him." (Emphasis added.) See, e.g., *State* v. *Salamon*, 287 Conn. 509, 565, 949 A.2d 1092 (2008) ("it is improper for a prosecutor, in his [or her] argument, to refer to evidence that has been stricken or ruled inadmissible"). Accordingly, we conclude that the prosecutor acted improperly when she used the term "snitch" in this context.

E

The defendant next claims that, during closing arguments, the prosecutor improperly appealed to the jurors' emotions and commented on facts not in evidence by describing Floyd as "not a sophisticated criminal" in juxtaposition to her description of the defendant as "more

sophisticated . . . ." According to the defendant, "[t]hese comparisons . . . undeniably invite[d] the jurors to speculate as to the defendant's criminal record and improperly suggest[ed] prior violence . . . ." We are unpersuaded.

The following additional facts and procedural history are necessary to our resolution of this issue. During closing arguments, the prosecutor described Floyd as "not a sophisticated criminal" several times. First, the prosecutor argued that "[the defendant] didn't pick very wisely with . . . Floyd because, as was evident from the witness stand and also all the evidence that came out here . . . *Floyd is not a very sophisticated criminal, right.* You heard that he had never been arrested before this crime. He's driving around in a vehicle that's registered to him, he has a phone that's in his mother's name, and he might have gotten rid of the gun, but he didn't get rid of his phone. And his phone had all of that evidence on it, all of these screenshots . . . . Floyd looked up the day before information about a Glock, looked up how fast a Slingshot went, told you that he saw this photo of [the victim] on [his] Facebook account. All of that was on . . . Floyd's phone, screenshots before, screenshots after, screenshots of the location of the murder . . . . He should have gotten rid of his phone in addition to the gun, *but he didn't because he's not a sophisticated criminal.*" (Emphasis added.)

Later in her closing arguments, the prosecutor drew comparisons between the defendant's and Floyd's actions following the murder, arguing that, "[w]ith [the defendant], again . . . *Floyd is not very sophisticated*, but [the defendant] is driving around in a car that he purchased off Facebook Marketplace five days before the murder . . . ." (Emphasis added.) The prosecutor continued, stating "that phone number [that the defendant provided the seller of the car] is not registered, it's not in the defendant's name, *because again, he's a little bit more sophisticated than . . . Floyd.*" (Emphasis added.)

On appeal, the defendant argues that the prosecutor's use of the term "sophisticated" to describe him

"undeniably implie[d] that the defendant [had] committed crimes in the past to warrant such experience . . . [which] [was] not a reasonable inference that could be drawn from the evidence, as the defendant's criminal history was not in the record." When read in context, however, the prosecutor's characterization of the defendant as "a little bit more sophisticated than . . . Floyd" referred to the steps that the defendant and Floyd had taken to conceal their involvement in the victim's death, not the defendant's criminal history, and was a reasonable inference drawn from the evidence.

In characterizing Floyd as "not a sophisticated criminal" and "not very sophisticated," the prosecutor was referring to Floyd's use of a vehicle registered in his name and a phone registered in his mother's name during the commission of the underlying crime, keeping that phone on his person leading up to his arrest, taking and keeping screenshots of photographs of the victim and his family, and conducting incriminating Internet searches. The prosecutor explained that the defendant, on the other hand, had purchased the Nissan—which he did not register in his name—off of Facebook Marketplace just five days before the victim's death and provided the seller with a fake name and a phone number that was not registered in his name. Based on this evidence, the jury reasonably could have inferred that the defendant took those steps to conceal his identity. Surely, it is reasonable to infer that one who takes additional steps to conceal his or her identity or involvement in a crime is "a little bit more sophisticated" than one who does not take those steps, regardless of his or her criminal background. This characterization, therefore, was a reasonable inference based on the evidence because it referred to the defendant's specific conduct in this case as it related to concealing his involvement with the murder rather than the defendant's general criminal history. Although the defendant contends that "[i]t strains credulity that the jury would not identify such similarities to infer that the state was describing the defendant as a sophisticated criminal," the prosecutor was clear that, in referring to

the defendant as "a little bit more sophisticated than . . . Floyd," she was referencing not the defendant's criminal background, but how the defendant had provided the seller of the Nissan with a phone number that was not registered to him whereas Floyd had used a phone number registered in his mother's name.

Accordingly, the defendant has failed to demonstrate that the prosecutor acted improperly by describing Floyd as "not very sophisticated" and referring to the defendant as "more sophisticated . . . ."

F

The defendant next claims that, during closing arguments, the prosecutor improperly appealed to the jurors' emotions by using "[r]acially biased language" that "encourag[ed] [the jurors] to convict [the defendant] based on propensity and fear based grounds, rather than the evidence before them." The defendant also claims that the prosecutor improperly commented on facts not in evidence. Specifically, the defendant contends that the prosecutor engaged in impropriety by misstating the evidence when asserting that Castro had testified that the defendant used a "street name," "utiliz[ing] slang that [she] qualified in terms of the 'street,'" and using the word "beef." The defendant argues that the prosecutor's use of the term "snitch" was improper because it "only served to invoke assumptions and stereotypes about what happens to 'snitches' on the 'street.'" We agree with the defendant insofar as he contends that the prosecutor misstated the evidence in the record by asserting that Castro had testified that the defendant used a "street name." Nevertheless, we are unpersuaded that the prosecutor's use of the phrase "street term" and the word "beef" were improper. We address each alleged impropriety in turn.

The defendant first claims that the prosecutor committed impropriety when she argued that "[Castro] said he said some *street name* when she gave him the car, but she doesn't remember what it was . . . ." (Emphasis

added.**)** We have not found, and the state has not called our attention to, any point at which Castro testified that the defendant gave her "some street name . . . ." Rather, the record reveals that Castro testified that she sold the Nissan to "[s]ome guy," and, when asked whether she remembered or learned the buyer's name, Castro replied, "[n]o."[21] Accordingly, the prosecutor's assertion that Castro had testified that the defendant gave her "some street name" was not grounded on any evidence in the record and was therefore improper.

The defendant also claims that the prosecutor improperly argued that "what [Floyd] did by coming in here and getting up on the witness stand, you know, in the *street term*, right, he was kind of a snitch, right." **(**Emphasis added.**)** According to the defendant, this characterization "further charged the [jurors] to view the defendant as a dangerous 'street' criminal, encouraging them to convict based on propensity and fear based grounds, rather than the evidence before them. There was no evidence . . . warrant[ing] linking the defendant to 'street' terms." The prosecutor, however, was not calling the defendant a "street criminal" or implying that there were some "street crimes o[r] affiliations" linked to the defendant. Rather, the prosecutor was characterizing her use of the word "snitch" as being a "street term . . . ." Accordingly, the defendant has failed to show that the prosecutor acted improperly by using the phrase "street term" in this context.

Finally, the defendant contends that the prosecutor's use of the term "beef" to describe the defendant's motive was improper because it was never used in evidence.[22]

---

[21]Although the defendant used the name "Willie Mays" when communicating with Castro on Facebook, there is no evidence in the record to support the inference that "Willie Mays" is the defendant's "street name."

[22]Specifically, the prosecutor argued that "[the defendant] planned, conspired and had the same intent as . . . Floyd, and I would submit to you that [the defendant] had even more of an intent [than] . . . Floyd because you heard what the motive for this killing was. You heard that it was over another individual by the name . . . Edwards, who [the defendant] didn't really care too fondly for because [he] had given

Although "beef" certainly is a colloquial term, "[i]t does not follow . . . that every use of rhetorical language or device [by the prosecutor] is improper. . . . The occasional use of rhetorical devices is simply fair argument." (Internal quotation marks omitted.) *State* v. *Michael T.*, supra, 338 Conn. 723–24. The defendant does not explain why it would be improper for a prosecutor to use this term even if it was not in evidence, especially because, as the defendant acknowledges in his brief, " 'beef' . . . [is] a *common* slang term interpreted to mean a grudge or animosity . . . ." (Emphasis added.) The defendant also has not explained how the word "beef" would improperly appeal to the jurors' biases or otherwise stigmatize the defendant. The defendant therefore has failed to demonstrate that the prosecutor's use of the word "beef" was improper. Accordingly, we conclude that the prosecutor did not act improperly by using the word "beef" or describing the word "snitch" as a "street term . . . ."

G

Finally, the defendant claims that the prosecutor improperly appealed to the jurors' sympathies when she made certain remarks during closing argument regarding the victim. We agree that, when viewed in their totality, the prosecutor's comments regarding the victim constituted an improper appeal to the jurors' emotions.

The defendant alleges that the following four arguments made by the prosecutor during her closing arguments were improper appeals to the jurors' emotions:

"I started my opening statement by telling you that [the victim] was murdered two days before his twenty-third birthday, and, based on the evidence that you heard in this case, I'm going to open my closing with that same line—that he was killed two days before his twenty-third birthday; however, based on the evidence that unfolded over the past week, it's clear that this was a planned execution . . . ."

some information over . . . previously. So, that's what this was about; it was [the defendant's] *beef* in this case, and, in some sense . . . Floyd was kind of a pawn in [the defendant's] plan here." (Emphasis added.)

The prosecutor later argued, "[b]ut, at the end of the day [the victim] was a twenty-two year old kid who really hadn't lived. And, whatever, you've heard no evidence about anything [in] his background that would have led to something like this; so, he had some marijuana on him, you know, really, does that mean he deserves what happened to him? I would submit no, it doesn't."

The prosecutor also argued, "[s]o, the evidence in this case that you saw was that [the victim] was enjoying two days before his birthday, it was a Sunday afternoon, right, he was driving around in that car, which, you know, some people might say is flashy, but, to a twenty-two year old kid, he's excited about it, right, he's driving around in it, he's posting about it on Facebook, he's with his friend . . . who you heard from. They went to a barbeque, he saw his mom, he saw his new baby, he was . . . with his mom at the house. And then he was just going to a pool party later that day; he's just enjoying life." The prosecutor then played a video of the victim and stated, "[i]t's kind of hard to watch that as well as the video of him in the . . . gas station because we know now, watching it, right, it's the last few minutes of his life. He was enjoying the last few minutes, right, being a young kid, driving around, just enjoying himself. And then the next shot that we see, five minutes later—" The prosecutor then displayed for the jury a photograph of the victim and stated, "[f]ive minutes later [the victim] is dead in his car, shot in the head, shot in the neck."

Finally, as part of her rebuttal argument, the prosecutor stated: "[The victim] was, again, twenty-two years old. He did not deserve to die this way. This was a senseless killing, and I'm going to ask you to convict the defendant on all counts." The defense did not object to any of these statements.

On appeal, the defendant contends that "[t]hese four comments have no probative value and can only be interpreted to be intended to improperly appeal to the emotions of the jurors." According to the defendant, "[i]t was never in dispute that [the victim] was twenty-two

years old, that the crime happened two days before his birthday, that he had a new baby, and that he saw his mother and the baby that day." In response, the state argues that these comments did not improperly appeal to the jurors' emotions. Specifically, the state contends that "[t]he [prosecutor] commented on the victim's recent birthday and visit with his child to explain: (1) why he was driving the sporty Slingshot on the day of the murder . . . and (2) that the murder was planned and not the instantaneous result of any dispute between the victim and the defendant. . . . Moreover, in reminding the jury that the victim was a real person with a future, who was 'enjoying life,' and whose murder was 'senseless,' the [prosecutor] fairly commented on the seriousness of the charges and the jury's important obligation to evaluate the evidence."

With respect to the prosecutor's references to the age of the victim, we acknowledge that the victim's age was properly introduced into evidence. We also note that this court previously has concluded that a prosecutor's brief references to a victim's age or youth were not improper. See, e.g., *State* v. *Patterson*, 170 Conn. App. 768, 794–95, 156 A.3d 66 (prosecutor's remark that victims were "'pretty much teenagers'" "did not improperly appeal to the emotions of the jury"), cert. denied, 325 Conn. 910, 158 A.3d 320 (2017); *State* v. *Maner*, 147 Conn. App. 761, 791–94, 83 A.3d 1182 (prosecutor's references to victim as "poor young James Caffrey" and "poor young man in Waterbury lying dead in his hallway" during initial argument to jury were based on evidence and "nothing more than a permissible rhetorical flourish" (internal quotation marks omitted)), cert. denied, 311 Conn. 935, 88 A.3d 550 (2014). Similarly, insofar as the defendant takes issue with the prosecutor's remark that "[the victim] did not deserve to die this way," such statements are not necessarily improper. See *State* v. *James*, 54 Conn. App. 26, 48, 734 A.2d 1012 (no impropriety where prosecutor remarked that "despite all of [her] problems [the victim] doesn't deserve to be dead . . . [s]he doesn't deserve—she didn't deserve to die at

the hands of [the defendant]" (internal quotation marks omitted)), cert. denied, 251 Conn. 903, 738 A.2d 1092 (1999). Moreover, the defendant does not contend that these remarks were comments on facts not in evidence or unreasonable inferences based on the evidence presented. Therefore, the prosecutor's references to the victim's age and the manner of his death, in isolation, were not necessarily improper.

We agree, however, with the defendant that, when read in totality, the repeated references to the victim's age and birthday, and the description of the victim's actions leading up to his death, including his visit with his mother and his new baby were improper because these facts, although in evidence, had no connection to the issues presented but, rather, seemingly were calculated solely to appeal to the jurors' emotions in an effort to elicit sympathy for the victim. See, e.g., *State* v. *Henry B.-A.*, 234 Conn. App. 197, 216, 342 A.3d 1063 ("statements that have no reasonable connection to evidence offered *or issues presented* in a case are more likely to be deemed improper" (emphasis added; internal quotation marks omitted)), cert. denied, 353 Conn. 934, 347 A.3d 876 (2025); *State* v. *Montoya*, 110 Conn. App. 97, 108, 954 A.2d 193 ("[e]ven though the prosecutor's statements were grounded in evidence, her language invoked overly sympathetic images of the victim that improperly appealed to the emotions of the jury"), cert. denied, 289 Conn. 941, 959 A.2d 1008 (2008).

Although the state contends that the remarks concerning "the victim's recent birthday and visit with his child [were meant] to explain: (1) why he was driving the sporty Slingshot on the day of the murder . . . and (2) that the murder was planned and not the instantaneous result of any dispute between the victim and the defendant," these arguments are unavailing. It is unclear how these asserted reasons for the victim's driving the Slingshot would be relevant to the issues presented at trial. Similarly, it is unclear how any of the prosecutor's references to the victim's actions prior to his death would show

that the defendant planned the murder. In addition, the defendant never argued that the victim's death occurred as an "instantaneous result of any dispute," and, more importantly, there is no indication in the record that that is why the prosecutor argued those facts. We also reject the state's argument that, "in reminding the jury that the victim was a real person with a future, who was 'enjoying life,' and whose murder was 'senseless,' the [prosecutor] fairly commented on the seriousness of the charges and the jury's important obligation to evaluate the evidence." The prosecutor made those remarks while playing a video that showed the victim prior to his death and emphasizing that "[i]t's kind of hard to watch . . . because we know now, watching it . . . it's the last few minutes of his life" before displaying for the jury a photograph of the victim and stating, "[f]ive minutes later [the victim] is dead in his car, shot in the head, shot in the neck." Simply put, the prosecutor's comments regarding the victim, especially in combination with her use of visual aids, appear to have been a gratuitous plea for sympathy for the victim and, therefore, were improper.

H

We have concluded that improprieties occurred during the prosecutor's closing arguments, namely, her **(1)** use of the term "snitch," which improperly referenced testimony stricken by the court, **(2)** assertion that Castro had testified that the defendant used a "street name," which was contrary to her actual testimony, and **(3)** improper appeal for sympathy for the victim. We therefore must consider whether the defendant has demonstrated that any of those improprieties deprived him of his due process right to a fair trial. See *State* v. *Antwon B.*, supra, 236 Conn. App. 455.

As we explained previously in this opinion, to determine whether prosecutorial improprieties deprived the defendant of his right to a fair trial, we must consider the *Williams* factors. See *State* v. *Williams*, supra, 204 Conn. 540. Moreover, we must look at the effect of the

sum total of the prosecutor's improprieties on the trial as a whole. See *State* v. *Dabate*, supra, 351 Conn. 437.

First, the state concedes that none of the alleged improprieties were invited by the defendant, and we therefore weigh this factor in his favor. As to the second *Williams* factor, when viewed in the context of the entire trial, the improprieties were not severe. It is well settled that, "when evaluating severity, we take into consideration whether defense counsel object[ed] to any of the improper remarks, request[ed] curative instructions, or move[d] for a mistrial." (Internal quotation marks omitted.) *State* v. *Gary S.*, 345 Conn. 387, 418, 285 A.3d 29 (2022). Here, defense counsel did not object to any of these improprieties, "a choice that demonstrates that defense counsel presumably [did] not view the alleged impropriet[ies] as prejudicial enough to jeopardize seriously the defendant's right to a fair trial." (Internal quotation marks omitted.) Id. Moreover, in circumstances such as this one, where the defendant has failed to object to the improprieties, this court has indicated that "only instances of grossly egregious misconduct will be severe enough to mandate reversal." (Internal quotation marks omitted.) *State* v. *Ross*, 151 Conn. App. 687, 701, 95 A.3d 1208, cert. denied, 314 Conn. 926, 101 A.3d 271 (2014). The prosecutor's conduct in this case cannot be said to be so egregious that it deprived the defendant of a fair trial. Compare *State* v. *Sullivan*, 351 Conn. 798, 823, 334 A.3d 446 (2025) (concluding that prosecutor's use of phrase "'nuts and sluts'" "was gratuitous and inflammatory and ha[d] no place in our courts" but was not so egregious that it deprived defendant of fair trial), and *State* v. *Camacho*, 282 Conn. 328, 383, 924 A.2d 99 ("Although the prosecutor undeniably crossed the line with his religious pedagogy and evocation of the victim's blood crying out for justice, we do not believe that these rhetorical devices so prejudiced the defendant as to render the entire trial unfair or the verdict untrustworthy. We do not view these statements as grossly egregious . . . [and] severe enough to mandate reversal." (Internal quotation marks omitted.)), cert. denied, 552 U.S. 956,

128 S. Ct. 388, 169 L. Ed. 2d 273 (2007), with *State* v. *Parris*, 352 Conn. 652, 678, 682, 338 A.3d 1139 (2025) (new trial was warranted where impropriety was "inexcusable" because "prosecutors' misstatements of the law severely distorted the required legal analysis of the extreme emotional disturbance defense—the defendant's only defense to the murder charge against him—in a number of ways"), and *State* v. *Mills*, 57 Conn. App. 202, 209–10, 748 A.2d 318 (prosecutorial improprieties were so egregious that new trial was warranted where prosecutor "asked that the jury not victimize the victim again," "appealed to the jurors to convict so that evil would not triumph by their inaction," and "spoke the victim's name with such repetition and used such strong, inappropriate language that it could only be inferred that his intent was to appeal to the sympathies and emotions of the jury"), cert. denied, 253 Conn. 914, 754 A.2d 163 (2000), and cert. denied, 253 Conn. 915, 754 A.2d 163 (2000). Accordingly, this factor weighs in the state's favor.

In addition, although we have concluded that the prosecutor made improper statements during closing argument, the improprieties were infrequent when considered in the context of the entire trial, which lasted for seven days and consisted of fifty witnesses and nearly 400 exhibits, and the prosecutor's lengthy closing arguments. See, e.g., *State* v. *Dabate*, supra, 351 Conn. 464 (four instances of prosecutorial impropriety were not frequent "[w]hen considered in context of the 130 witnesses and the 600 exhibits during the five week trial"); *State* v. *Payne*, 303 Conn. 538, 567, 34 A.3d 370 (2012) (three improper statements made by prosecutor during lengthy closing argument were not frequent). Accordingly, the third and fourth *Williams* factors also weigh in favor of the state.

The fifth *Williams* factor requires us to consider the strength of the trial court's curative instructions. The court did not give any curative instructions directed specifically at any of the alleged prosecutorial improprieties

underlying the defendant's appeal. Nevertheless, because the defendant did not object to these improprieties as they occurred at trial, he "bears much of the responsibility for the fact that these claimed improprieties went uncured." (Internal quotation marks omitted.) *State* v. *Ross*, supra, 151 Conn. App. 702. Where, as here, the defendant did not object to any of the prosecutor's arguments, request curative instructions, or move for a new trial on the basis of the improprieties, it is difficult to conclude that they deprived him of a fair trial. See *State* v. *Johnson*, 107 Conn. App. 188, 203–204, 944 A.2d 416, cert. denied, 288 Conn. 905, 953 A.2d 650 (2008).

Moreover, although the trial court did not issue specific curative instructions, the improper effect of any impropriety was diminished by the court's general instructions to the jury following closing arguments. See *State* v. *Maurice B.*, 228 Conn. App. 720, 746, 324 A.3d 850 ("[i]n nearly all cases in which defense counsel fail[ed] to object to and request a specific curative instruction in response to a prosecutorial impropriety, especially an impropriety that we do not consider to be particularly egregious, and the court's general jury instruction addresse[d] that impropriety, we have held that the court's general instruction cures the impropriety" (internal quotation marks omitted)), cert. denied, 350 Conn. 929, 326 A.3d 249 (2024). When the court read its instructions to the jury, the court not only emphasized that arguments made by counsel were not evidence, but the court also instructed the jury to be mindful of any prejudices and implicit biases, to utilize "[t]echniques to identify and check one's implicit biases," and to remember that "decisions based upon biases for or against other people or stereotypes regarding other people have no place in the courtroom." The appellate courts of this state repeatedly have stated that, "[i]n the absence of a showing that the jury failed or declined to follow the court's instructions, we presume that it heeded them." (Internal quotation marks omitted.) *State* v. *Gonzalez*, 338 Conn. 108, 152, 257 A.3d 283 (2021); *State* v. *Thompson*, 266 Conn. 440, 485, 832 A.2d 626 (2003); *State* v. *Ross*, supra,

151 Conn. App. 703–704. The defendant has failed to demonstrate that the jury neglected to follow the court's instructions. We therefore conclude that this factor too weighs in favor of the state.

Finally, we conclude that the state's case was strong and "not so weak as to be overshadowed by the [prosecutor's] impropriet[ies]." (Internal quotation marks omitted.) *State* v. *Maurice B.*, supra, 228 Conn. App. 748. The state presented evidence that the victim was being followed by a Nissan and Floyd's BMW. The state introduced surveillance footage from local businesses prior to the shooting and the CSLI of Floyd's and the defendant's cell phones. The state also presented evidence that the defendant was the owner and operator of the Nissan at the time of the shooting and demonstrated that the Facebook account used to purchase the vehicle was connected to the defendant by both the account's profile photograph and email address. Moreover, the state connected the defendant to the Nissan through the CSLI evidence and the DNA evidence from the Lunchables container found in the vehicle and the vehicle's gas cap. Most importantly, the state presented the testimony of Floyd, who had conspired with the defendant to commit the crime and whose testimony directly linked the defendant to the shooting. Accordingly, because the state's case was both strong and persuasive, this factor also weighs in the state's favor.

In light of the strength of the state's case, the lack of objection to the claimed improprieties identified by the defendant, and the fact that they were not severe, frequent, or central to the state's case, we are not persuaded that "there is a reasonable likelihood that the jury's verdict would have been different absent the sum total of the [prosecutor's] improprieties." (Internal quotation marks omitted.) *State* v. *Ross*, supra, 151 Conn. App. 706. The defendant therefore has failed to establish that the trial was so fundamentally unfair that he was deprived of a fair trial in violation of his due process rights because of prosecutorial impropriety.

### III

The defendant finally claims that the trial court committed plain error by failing to provide the jury with a special credibility instruction regarding the testimony of a witness who had a cooperation agreement with the state.[23] The defendant neither requested a special credibility instruction at trial nor raised an objection to the charge as given but argues that the court should have given the instruction sua sponte. Because the defendant has failed to demonstrate that the court made an obvious and readily discernable error, we reject his claim of plain error.

The following additional facts and procedural history are necessary to the resolution of this claim. Prior to the

---

[23]Section 2.5-4 of the Connecticut Criminal Jury Instructions, titled, "Witness with a Cooperation Agreement," provides in relevant part:

"You have heard evidence that *<witness>* has signed a document entitled 'Cooperation Agreement' with the state, the terms of which are contained in *<Exhibit #>*. . . .

"Although the state is permitted to present the testimony of someone who has signed a cooperation agreement in exchange for (his/her) testimony, you must examine the testimony of such a witness who provides evidence against a defendant with greater care and caution than the testimony of an ordinary witness.

"While examining the testimony of a witness who has signed a cooperation agreement and . . . who has not yet been sentenced on a pending case . . . you should keep in mind that (he/she) may, in (his/her) own mind, be looking or hoping for some favorable treatment in the sentence, supervision, or disposition of (his/her) own matters, and therefore may have such an interest in the outcome of this case that (his/her) testimony may have been colored by that fact. In considering the testimony of such a witness, you may consider whether there was any motive developed in the evidence for testifying falsely in inculpating the accused. . . .

"Further, notwithstanding any language contained in *<Exhibit _>*, the cooperation agreement signed by *<witness>*, it is your exclusive role to determine the credibility and believability of that witness. In other words, you and you alone are to determine whether any evidence offered by *<witness>* is to be believed wholly, partly, or not at all, irrespective of any language in the cooperation agreement that may suggest otherwise. . . .

"It is your duty to decide what credibility to give any witness. Therefore, it is your duty to decide whether *<witness>* is to be believed wholly, partly, or not at all." (Emphasis in original.) See Connecticut Criminal Jury Instructions, available at https://www.jud.ct.gov/JI/Criminal/Criminal.pdf (last visited July 21, 2026).

defendant's trial, Floyd pleaded guilty to murder and faced a twenty-five year mandatory minimum term of incarceration in connection with the incident that is the subject of this appeal. On July 25, 2023, two days before the defendant's trial, Floyd and the state entered into a cooperation agreement that provided that, in exchange for Floyd's testimony against the defendant in this case, Floyd would be permitted to withdraw his guilty plea to murder and instead plead guilty to manslaughter in the first degree in violation of General Statutes § 53a-55 "with a promise of [f]ifteen years [of] incarceration." The cooperation agreement was admitted as a full exhibit with no redactions and without objection at the defendant's trial.

At the defendant's trial, the prosecutor asked Floyd why he agreed to the cooperation agreement. Floyd explained, "[b]ecause I wanted the truth . . . [and] I was mad [at] [the defendant]; I feel he used me." He then clarified: "I was mad at [the defendant]; I feel like he used me, and [it was] [a] lesser sentence [than] what I previously would have had." Defense counsel also cross-examined Floyd regarding his motivations for testifying and his significant sentence reduction.

Early in the trial, the trial court sent the parties an initial draft of the substantive portion of the jury charge. On August 3, 2023, after the close of evidence, the court met with counsel to discuss the jury charge and later sent them a revised and complete version of the draft charge. On August 4, 2023, the court again met with counsel to discuss the revised charge and sent them a final revised draft of the jury charge.. The defendant never objected to the court's proposed jury charge or specifically requested an instruction for a witness with a cooperation agreement.[24]

The trial court provided the jury with both an oral recitation and a written copy of the charge to have with

[24]The defendant took one exception to the charge on the record; however, that exception concerned an unrelated portion of the trial court's proposed jury instructions. Specifically, defense counsel stated: "[T]he one exception I did have to the charge—I know we noted this in the

it during deliberations. Regarding the credibility of witnesses, the court instructed the jury that, "[i]n deciding what the facts are, you must consider all the evidence. In doing this, you must decide which testimony to believe and which testimony not to believe. You may believe all, none, or any part of any witness' testimony. In making that decision, you make take into account a number of factors, including the following: **(1)** was the witness able to see, or hear, or know the things about which that witness testified; **(2)** how well was the witness able to recall and describe those things; **(3)** what was the witness' manner while testifying; **(4)** did the witness have an interest in the outcome of this case or any bias or prejudice concerning any party or any matter involved in the case; **(5)** how reasonable was the witness' testimony considered in light of all the evidence in the case; and **(6)** was the witness' testimony contradicted by what that witness has said or done at another time, or by the testimony of other witnesses, or by other evidence. Of course, you should use your common sense and good judgment in applying these factors."

The trial court also provided the jury with a special credibility instruction for accomplice testimony regarding Floyd: "In weighing the testimony of . . . Floyd, you should consider the fact that he has pleaded guilty to a charge of murder [in] this case. It may be that you would not believe a person who has committed a crime as readily as you would believe a person of good character. In

conference—was under conspiracy. I know there's a separate charge for circumstantial evidence, but I had made an exception to the circumstantial evidence since it's being a conspiracy charge . . . ." The court replied, "as to the charge to the jury on circumstantial evidence in the conspiracy charge, that's in the model instructions, and I think it's important to instruct the jury that conspiracies can be proven by circumstantial evidence. So, that exception is noted, but I'm not going to change my charge. We can do further exceptions at the conclusion of the charge." At the conclusion of its charge, the court asked the parties if they had any exceptions to its charge. Defense counsel stated that "[her] *only* exception . . . [was] [the] other exception [she] made before [regarding] the circumstantial evidence for conspiracy." (Emphasis added.) On appeal, the defendant has not challenged the trial court's decision regarding this exception.

weighing the testimony of an accomplice who has not yet been sentenced or whose case has not yet been disposed of, you should keep in mind that he may in his own mind be looking for some favorable treatment in the sentence or disposition of his own case. Therefore, he may have such an interest in the outcome of this case that his testimony may have been colored by that fact. Therefore, you must look with particular care at the testimony of an accomplice and scrutinize it very carefully before you accept it.

"You should also bear in mind, however, that there are many offenses that are of such a character that the only persons capable of giving useful testimony are those who are themselves implicated in the crime. It is for you to decide what credibility you will give to an accomplice and whether you will believe or disbelieve the testimony of a person who by his own admission has committed or contributed to the crimes charged by the state here. Like all other questions of credibility, this is a question you must decide based on all the evidence presented to you."

Our standard of review of this claim is well settled. "Our review with respect to whether to reverse a trial court's judgment under the plain error doctrine is plenary. . . . [The] doctrine, codified at Practice Book § 60-5, is an extraordinary remedy used by appellate courts to rectify errors committed at trial that, although unpreserved, are of such monumental proportion that they threaten to erode our system of justice and work a serious and manifest injustice on the aggrieved party . . . . It is axiomatic that, [t]he plain error doctrine . . . is not . . . a rule of reviewability. It is a rule of reversibility. . . . Put another way, plain error review is reserved for only the most egregious errors. . . .

"To prevail on an unpreserved claim under the plain error doctrine, the defendant must satisfy the two-pronged plain error test. First, the defendant must establish that there was an obvious and readily discernable error . . . . Second, the defendant must establish that the obvious and readily discernable error was so harmful

or prejudicial that it resulted in manifest injustice. . . . In sum, reversal is required only if the alleged error is *both* so clear *and* so harmful that it affects the fairness and integrity of and public confidence in the judicial proceedings. . . .

"When reviewing the challenged jury instruction . . . we must adhere to the well settled rule that a charge to the jury is to be considered in its entirety, read as a whole, and judged by its total effect rather than by its individual component parts. . . . [T]he test of a court's charge is not whether it is as accurate [on] legal principles as the opinions of a court of last resort but whether it fairly presents the case to the jury in such a way that injustice is not done to either party under the established rules of law. . . . As long as [the instructions] are correct in law, adapted to the issues and sufficient for the guidance of the jury . . . we will not view the instructions as improper." (Citations omitted; emphasis in original; internal quotation marks omitted.) *State* v. *Orlando F.*, 233 Conn. App. 1, 34–35, 338 A.3d 379, cert. denied, 353 Conn. 903, 341 A.3d 957 (2025).

"Our Supreme Court has emphasize[d] that it has been especially rare for a jury instruction to be so clearly improper that our courts have deemed plain error review necessary to correct it. . . . This court has done so when the trial court has affirmatively misstated the law . . . and when it has failed to comply with a statute that mandates a particular instruction. . . . We do not suggest that there are no other circumstances in which an instruction could constitute plain error, but the reluctance with which we have chosen that course underscores that plain error is reserved for only the most egregious defects." (Citations omitted; internal quotation marks omitted.) Id., 36–37.

"[W]hether an error is clear is premised on the law existing at the time of trial." (Internal quotation marks omitted.) Id., 36. We have stated therefore that "[t]he defendant . . . cannot establish that the court committed plain error in failing to provide the jury with an instruction that it was not required to give [or] that our

Supreme Court has stated *may* be appropriate in a given case." (Emphasis in original.) Id.

The defendant does not argue that the trial court's instruction as to accomplice testimony was improper but, rather, that the instruction misled the jury by understating Floyd's motivations to testify. The defendant, however, has not cited, and we have not found, any authority for the proposition that the court, sua sponte, must give the jury a special credibility instruction for a witness with a cooperation agreement or that an accomplice testimony instruction would be insufficient in these circumstances.[25] Rather, our Supreme Court has recognized that, "[g]enerally, a [criminal] defendant is *not* entitled to an instruction singling out any of the state's witnesses and highlighting his or her possible motive for testifying falsely. . . . [The] court has held . . . that *a special credibility instruction is required for three types of witnesses, namely, complaining witnesses, accomplices and jailhouse informants*." (Citation omitted; emphasis altered; internal quotation marks omitted.) *State* v. *Bruny*, 342 Conn. 169, 202, 269 A.3d 38 (2022). Neither our Supreme Court nor this court, however, has ever held that there is a *fourth* category of special credibility instructions required for a witness with a cooperation agreement with the state, much less that the trial court must issue that instruction sua sponte.[26] Indeed, it is well settled that "it

[25] In his reply brief, the defendant relies on *State* v. *Calhoun*, 346 Conn. 288, 298, 289 A.3d 584 (2023), for the proposition that "[o]ur Supreme Court has acknowledged how the witness with a cooperation agreement provides a stronger and more comprehensive warning than other special credibility instructions." Even if we assume, arguendo, that the defendant is correct in this assertion, just because a special credibility instruction for a witness with a cooperation agreement is "stronger and more comprehensive" than other warnings does not mean that a court is *required* to give that instruction, much less to give it sua sponte. See *State* v. *Orlando F.*, supra, 233 Conn. App. 36 ("[t]he defendant . . . cannot establish that the court committed plain error in failing to provide the jury with an instruction that it was not required to give and that our Supreme Court has stated *may* be appropriate in a given case" (emphasis in original)).

[26] The defendant, in essence, advocates for a *new* rule requiring a trial court to issue a witness with a cooperation agreement instruction

is within the discretion of a trial court to give a cautionary instruction to the jury whenever the court reasonably believes that a witness' testimony may be particularly unreliable because the witness has a special interest in testifying for the state and the witness' motivations may not be adequately exposed through cross-examination or argument by counsel." *State* v. *Diaz*, 302 Conn. 93, 113, 25 A.3d 594 (2011). The alleged error by the trial court therefore could not have been "clear, obvious and indisputable" based on the law existing at the time of trial. See *State* v. *Silva*, 339 Conn. 598, 621, 262 A.3d 113 (2021) ("[T]he defendant . . . seeks a novel exception to the general rule against singling out a witness and highlighting the witness' motive to testify falsely. . . . [T]his court has yet to endorse, let alone require, trial courts to provide such an instruction. . . . A fortiori . . . the trial court's failure to provide the instruction, *sua sponte*, cannot constitute plain error." (Citations omitted; emphasis in original; internal quotation marks omitted.)). Accordingly, the court cannot be said to have committed plain error.

The judgment is affirmed.

In this opinion the other judges concurred.

---

whenever such a witness testifies. Even if we assume, arguendo, that the defendant is correct insofar as he contends that it should be the rule, "it is not enough for the defendant simply to demonstrate that his position is correct. Rather, the party seeking plain error review must demonstrate that the claimed impropriety was so clear, obvious and indisputable as to warrant the extraordinary remedy of reversal." *State* v. *Coward*, 292 Conn. 296, 307, 972 A.2d 691 (2009). The defendant has failed to do so here.